UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

MATTHEW WOODS,

                Plaintiff,

-vs-                                 Case No.  5:05-cv-394-Oc-10GRJ

PAUL VALENTINO, in his individual
capacity; DEVON TURNER, in his
individual capacity; RITA BUTZ, in her
individual capacity; WILLIAM "BILL"
OLSEN, in his individual capacity;
ANDREW WILLIAMS, JR., in his individual
capacity; DEBORAH RODDEN WILLIAMS,
or Debbey - in her individual capacity,

                Defendants.

_____

## O R D E R

The Plaintiff, proceeding *pro se*, initiated this action on September 12, 2005, with the filing of a seven count Complaint alleging numerous violations of his constitutional rights under 42 U.S.C. § 1983. Each Defendant has filed a motion for summary judgment on all claims. (Docs. 91, 92, 95, 96, 97). The Plaintiff has filed a response in opposition to each motion, along with supporting affidavits and other evidence. (Docs. 106, 107, 108, 109, 110, 111, 112). Accordingly, the motions are all ripe for disposition. Upon due consideration, and for the reasons set forth below, the Court finds that the Defendants' motions for summary judgment are due to be granted in part and denied in part.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The pleadings, memoranda, affidavits and other evidence in the record, construed in the manner most favorable to the Plaintiff, disclose the following details.[1]

I.    The Parties

The Plaintiff, Matthew Woods, and his mother, Della Woods, lived at 37733 Ridgecrest Lane, Lady Lake, Florida from November 1997 until May or June of 2003.  In 1999, Defendants Andrew Williams, Jr., and his wife Deborah Rodden Williams moved next door to the Plaintiff's Lady Lake home.  Andrew Williams worked as a Lake County Deputy Sheriff from 1997 until June or July 1999.  On July 16, 1999, Andrew Williams began employment as a Deputy Sheriff of the Orange County Sheriff's Office; a position he continues to hold today.  Deborah Williams has never been employed by or worked as an agent for either the Lake County or Orange County Sheriff's Offices.  Andrew Williams is an African America; Deborah Williams is Caucasian.

At all times relevant to this case, Defendants Paul Valentino, William Olsen, Devon Turner, and Rita Butz, (the "Officer Defendants"), were employed as Law Enforcement Officers in the State of Florida.   Valentino has been a member of the City of Lady Lake Police Department since June 9, 1993.  He was promoted to the rank of Sergeant on

---

[1]The Plaintiff attempts to create numerous factual issues throughout his responses, affidavit, and the affidavit of his mother, Della Woods.  The bulk of these purported factual discrepancies involve facts or events that are either outside the relevant time period or are completely irrelevant to the claims before the Court.  The Court will therefore limit its discussion to only those facts which are relevant and necessary to an analysis of the claims at issue.

September 4, 1997, and promoted to Lieutenant on November 29, 2004.  Valentino retired from the police department in June of 2005, and now serves as a Law Enforcement Officer with the City of Wildwood Police Department.  Olsen has been employed with the City of Lady Lake Police Department since February 2000.  At the time of the events in question, Olsen was assigned to uniformed road patrol and held the position of Field Training Officer. He currently holds the position of Sergeant.  Butz has been with the City of Lady Lake Police Department since December 2002, and was an Officer-Trainee on the date in question in 2003.  She currently holds the rank of Detective.  At all times relevant to this case, Defendant Devon Turner was a Deputy Sheriff with the Lake County Sheriff's Office.

II.    The Injunction

Interactions between the Plaintiff and Della Woods and their neighbors Andrew and Deborah Williams deteriorated fairly quickly.  Between November 1999 and December 2002, both families engaged in numerous negative and, at times, hostile interactions. On at least four occasions Andrew and Deborah Williams filed police complaints against the Plaintiff and Della Woods, alleging, among other things, that Della Woods would yell obscenities and racial slurs at the Williams family on a regular basis, and that the Plaintiff would drive his car up and down the Williams' private drive at a high rate of speed and flash his headlights into the Williams' bedroom windows throughout the night.  The Plaintiff and Della Woods also filed numerous police complaints against the Williams family. The substance of those complaints ranged from a claim that the Williams' family dog was

snarling at Della Woods and barking in an angry manner, to claims that there were "strange cars" driving up to the Williams' home and down the private drive.

On December 17, 2002, Andrew Williams filed a police complaint with the Lake County Sheriffs Office against the Plaintiff and his mother alleging that the Plaintiff shined a high beam flashlight into the Williams' living room and into Andrew Williams' face when he went outside to investigate.  The Plaintiff then allegedly began to yell obscenities at Andrew Williams and threatened to attack Mr. Williams.  A short time later, Andrew Williams' daughter observed the Plaintiff crouched down on the southeast corner of the Williams' property, holding a flashlight and what appeared to be a black handgun.

The next day, Andrew Williams filed a petition in the Circuit Court of the Fifth Judicial Circuit, In and For Lake County, Florida, requesting an injunction against both Matthew and Della Woods for protection against repeat violence.[2]  A temporary injunction was issued on December 18, 2002.[3]  On December 26, 2002, following notice and a hearing  at which both the Plaintiff and Della Woods were present, the court issued a Final Judgment of Injunction.[4]  Among other things, the injunction prohibited Matthew and Della Woods from coming within 100 yards of the Williams' home and from having any contact, directly or

---

[2]See Affidavit of Andrew Williams, ("A. Williams Aff."), ¶ 9, Exhibit A (Doc. 93-3).

[3]Id., ¶ 10, Exhibit B.

[4]Id., ¶ 10, Exhibit C.

indirectly with Andrew or Deborah Williams "in person, by mail, e-mail, fax, telephone, through another person, or in any other manner."[5]

III. The Arrest

On February 23, 2003, Valentino was dispatched to the Plaintiff's home at 9:30 a.m. in response to an harassment complaint filed by Della Woods. Ms. Woods complained that the Williams' dog was barking and lunging at her while she and the Plaintiff were installing a fence on their property.[6] Valentino left without incident.

Later that same day, the City of Lady Lake Police Department responded to an anonymous phone call complaining that Della Woods was using profane language towards children in the area near her home. Defendants Valentino, Olsen and Butz responded to the call, and made contact with Della Woods at the front door of her home at approximately 5:30 p.m. that afternoon. After speaking with Della Woods without incident, Valentino, Olsen and Butz left the Woods' residence. Deborah Williams then approached the officers and advised them that several signs had been constructed on the Woods' property facing the Williams' home. She did not identify who put the signs on the Woods' property. The signs contained several offensive comments impugning the nature of the Williams'

---

[5]Id.

[6]At all times the Williams' dog remained on the Williams' property, behind a fence.

marriage, accusing Andrew Williams of being a "dirty cop," and calling the Williams family a "violent family."[7]

Deborah Williams then informed Valentino, Olsen and Butz that these signs violated the injunction against both the Plaintiff and Della Woods and provided the police officers with a copy of the injunction for their review.  The police officers returned to the Woods' property, where they observed four signs containing the offensive comments.  The officers went back to the front door of the Woods' home and spoke with the Plaintiff and his mother through the windows.  After some discussion, the Plaintiff left his house through a back door and took the signs down.  Olsen and Butz contend that while the Plaintiff removed the signs, he and his mother began to yell at Andrew Williams, who was standing on his own property and taking photographs of the signs.  Valentino, however, only recalls Della Woods yelling at Mr. Williams, and the Plaintiff asserts that he did not speak to Mr. Williams at all.

Based on their personal observations and conversations with Andrew and Deborah Williams, Valentino, Olsen and Butz concluded that they had sufficient probable cause to find that both the Plaintiff and Della Woods were in violation of the injunction.  However, they also determined that the Williams' home was outside the jurisdiction of the Lady Lake

_____

[7]See Affidavit of William "Bill" Olsen ("Olsen Aff."), ¶ 5, Exhibits 2-5 (Doc. 95-3).  The Plaintiff contends that Deborah Williams told the officers that it was Della Woods who erected the signs.  However, the Plaintiff has not presented any evidence establishing this fact.  To the contrary, all of the record evidence shows that Ms. Williams did not know who erected the signs, and did not provide the specific identify of the person responsible to any of the officers.  See, e.g., Affidavit of Deborah Williams ("D. Williams Aff."), ¶ 8.

Police Department and requested the assistance of the Lake County Sheriffs Department. Defendant Turner responded to the request, and was apprised of the situation by Valentino, Olsen and Butz.  Turner then went up to the front door of the Woods' home and spoke with Della Woods through a window.  Valentino and Olsen were standing next to Turner, with Butz standing behind them.

At this point the Parties' accounts diverge sharply.  The Officer Defendants all assert that Turner eventually convinced Della Woods to open her door by offering to provide her with copies of Andrew Williams' police statement and the injunction.  When Ms. Woods opened her front door, Turner dropped the papers, causing Ms. Woods to bend down to pick them up, and Turner arrested her.  The Officer Defendants further contend that when Turner arrested Della Woods, the Plaintiff came charging at the front door in an attempt to prevent his mother's arrest, and tried to slam the door on Turner's arm, which was caught in the front doorway.  In doing so, the Plaintiff slammed the door onto Turner's foot.  A slight struggle ensued between Turner, Valentino and the Plaintiff, which ended after Valentino sprayed a small amount of pepper spray on the Plaintiff's face.

The Officer Defendants further assert that Butz and Olsen did not participate in the Plaintiff's arrest.  They contend that Butz never touched the Plaintiff; although she assisted in keeping the front door open, she was overcome by the blow back from the pepper spray and had to be assisted by another officer.  Olsen contends that at the time of the Plaintiff's initial arrest inside his home, Olsen was escorting Della Woods to his squad car.

The Plaintiff, however, paints a very different picture.  He contends that Della Woods never opened the front door at any point in time.  Instead, he claims he was standing in the hallway behind the closed front door with his mother, when all four Officer Defendants broke down the door and entered the Plaintiff's home, without a warrant, consent, or exigent circumstances.  The Plaintiff contends that the Officer Defendants slammed the front door into the Plaintiff, pinning him behind the door, and that Valentino grabbed him by the hair and sprayed a large volume of pepper spray onto his face and into each nostril. The Plaintiff further claims that Valentino sprayed the Plaintiff's entire body with pepper spray, including his genitals.  As a result of the Officer Defendants' actions, the Plaintiff suffered a broken left wrist, a broken right foot, and split toenails.

The Parties all agree that after the Plaintiff was subdued, Valentino arrested him and took him out to the front yard to begin decontamination from the pepper spray.  Valentino irrigated the Plaintiff's' face for a few  minutes, and then transferred the Plaintiff over to the custody of Olsen for examination by Lake County Fire Rescue personnel.[8]

The Plaintiff alleges that all of the Officer Defendants were laughing and congratulating each other over their arrest of both the Plaintiff and Della Woods, and that several of them threatened the Plaintiff with further physical harm.  In particular, he claims that Olsen yelled at him and threatened to beat and kill him while Olsen escorted the Plaintiff over to the Lake County Fire Rescue truck.  The Plaintiff further alleges that while

---

[8]Olsen had previously requested that Lake County Fire Rescue be present.

8

he was awaiting a medical evaluation, Olsen beat the Plaintiff's  right foot with his fists, causing broken bones, permanent damage to prior skin grafts on that foot, and other permanent injury.

Lake County Fire Rescue evaluated the Plaintiff and determined that he was not in need of medical care.  Nevertheless, the Plaintiff demanded that he be taken to the hospital for examination.  The Plaintiff was taken by ambulance to the Villages Regional Hospital, where he refused treatment.[9]   A few weeks after his arrest, the Plaintiff sought medical treatment for his wrist and foot.  At that time, it was determined that the Plaintiff suffered a fracture to his left wrist, for which he underwent surgery, and a fracture to his right foot.

After the Plaintiff refused treatment at the hospital, he was transported to the Lady Lake Police Department, where he was charged with three misdemeanor offenses: (1) violation of an injunction against repeat violation, in violation of Fla. Stat. §§ 784.046 and 784.047; (2) resisting arrest without violence and obstruction, in violation of Fla. Stat. § 843.02; and (3) criminal mischief, in violation of Fla. Stat. § 806.13(3).[10]   Immediately following his arrest, Valentino prepared and signed an Arrest Affidavit/First Appearance Form for Matthew Woods and a "Probable Cause Affidavit." The Probable Cause Affidavit

---

[9]The Plaintiff also contends that one of the ambulance technicians attempted to strangle him during the ride to the hospital, and that the emergency room attending physician refused to treat him.

[10]The Plaintiff was charged with criminal mischief because he allegedly caused several thousand dollars worth of damage to the interior of the ambulance while en route to Villages Regional Hospital.

provided a short narrative describing the facts which formed the basis of the Plaintiff's arrest and his three misdemeanor charges.[11]

On May 24, 2004, the Plaintiff, who was represented by counsel, entered into a plea agreement whereby in exchange for pleading *nolo contendre* to the charge of Criminal Mischief, the prosecutor agreed to drop the other two charges.  The Plaintiff was ordered to pay court costs in the amount of $125.[12]

The entire course of events on February 23, 2003 lasted approximately two hours. During this time, none of the Officer Defendants attempted to obtain an arrest warrant for either Della or Matthew Woods.

IV.    Other Allegations Against the Defendants

Although the majority of the Plaintiff's claims in this case center on his arrest on February 23, 2003, he also alleges several other assorted acts on the part of the Defendants.  For example, he contends that starting at some point after July 15, 2002 and ending around the time of his arrest, each of the Defendants individually, repeatedly, and continuously threatened to attack and/or kill the Plaintiff if he did not move out of town.  He also alleges that on several occasions Andrew Williams pulled out his electronic tazer gun,

---

[11]See Affidavit of Paul Valentino ("Valentino Aff."), Exhibit 8, Attached as Exhibit C to Valentino's Dispositive Motion for Summary Judgment (Doc. 97-4).

[12]See Exhibit I, attached to Rita Butz's Dispositive Motion for Summary Judgment (DOC. 95-11).  Della Woods was ultimately convicted of one count of aggravated stalking, and ordered to pay a $5000 fine and sentenced to a five year term of probation.

showed it to the Plaintiff, and threatened to fire it at the Plaintiff if he and his mother did not leave town.

The Plaintiff contends that these incidents, as well as his arrest on February 23, 2003, were in retaliation for a lawsuit Della Woods filed against Andrew Williams and several other law enforcement officers and neighbors in July, 2002, as well as an opinion article the Plaintiff published in the local paper on November 24, 2002.  The opinion article discusses the concept of absolute privilege as applied to statements made during the course of judicial proceedings and does not mention or refer to any of the Defendants. Other than Andrew Williams, none of the Defendants in this case were parties to Della Woods' 2002 lawsuit.

Sometime in May or June 2003, the Plaintiff sold his home in Lady Lake and moved out of Lake County.  The Plaintiff contends that he did not want to move, but was forced to do so based on the Defendants' continued threats, and the Plaintiff's fear for his safety. The Plaintiff originally purchased his home for approximately $80,000 and sold it for approximately $115,000.[13]  He and his mother now live in Summerfield, Florida.

V.    Procedural History

On September 12, 2005, the Plaintiff filed a seven-count complaint against the Defendants, suing each of them in their individual capacity for various alleged civil rights violations.  (Doc. 1).  On July 6, 2006, the Court granted in part the Defendants' motions

---

[13]See Deposition of Matthew Woods ("Woods Dep."), pp. 38-41. (Doc. 94-2).

to dismiss, directed the Plaintiff to file an amended complaint, and directed him to strike any requests for attorneys' fees. (Doc. 41).

The Plaintiff filed an amended complaint on July 14, 2006, (Doc. 42), and with leave of Court, a second amended complaint on November 24, 2006 (Doc. 73). The second amended complaint, which now governs this case, consists of the following seven claims: (1) a Fourth Amendment claim against the Officer Defendants alleging illegal seizure and/or entry with respect to Woods' February 23, 2003 arrest; (2) a Fourth Amendment excessive force claim against the Officer Defendants; (3) a Fourth Amendment claim against Olsen alleging that he falsified his probable cause arrest affidavit; (4) a Fourth Amendment claim against Valentino alleging that he also falsified his probable cause arrest affidavit; (5) a Fourth Amendment excessive force claim against Olsen; (6) a First Amendment retaliation claim against all Defendants; and (7) a Fourteenth Amendment substantive due process claim against all Defendants.

## **SUMMARY JUDGMENT STANDARD**

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." Samples on Behalf of

Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  As the Supreme Court held in

Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of

establishing the nonexistence of a triable issue of fact.  If the movant is successful on this

score, the burden of production shifts to the non-moving party who must then come forward

with "sufficient evidence of every element that he or she must prove."  Rollins v.

Techsouth, 833 F.2d 1525, 1528 (11th Cir.  1987).  The non-moving party may not simply

rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or

other admissible evidence to demonstrate that a material fact issue remains to be tried.

## **DISCUSSION**

I.   Claims Against Andrew and Deborah Williams

The Plaintiff has asserted only two claims against Defendants Andrew and Deborah

Rodden Williams: (1) a § 1983 claim of unlawful retaliation in violation of the Plaintiff's First

Amendment right to free speech; and (2) a § 1983 claim for violation of the Plaintiff's

Fourteenth Amendment substantive due process rights.  In both claims, the Plaintiff

focuses on the following alleged facts: (1) the various threats Andrew and Deborah

Williams made against the Plaintiff in an effort to force him to relocate; (2) the injunction,

which the Plaintiff contends the Williams Defendants obtained by filing false police reports

and lying during the court hearing; and (3) the Plaintiff's arrest, which the Plaintiff contends

was based on the Williams Defendants deliberately lying about the identity of the person

who erected the offensive signs.  The Williams Defendants argue that they are entitled to

summary judgment because neither of them are state actors and therefore are not subject to liability under § 1983.  The Court agrees.

Title 42 U.S.C. § 1983 provides a cause of action against "[e]very person who, under color of any statute . . . of any State. . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ."  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  Wyatt v. Cole, 504 U.S. 158, 161 (1992).  Thus, to be entitled to relied under § 1983, the Plaintiff must show that Andrew and/or Deborah Williams deprived him of a right secured by the Constitution or federal law, and that the deprivation occurred "under color of state law."

The Supreme Court has defined "acting under color of law" as acting with power possessed by virtue of the defendant's employment with the state.  West v. Atkins, 487 U.S. 42, 49 (1988) ("[S]tate employment is generally sufficient to render the defendant a state actor.") (internal quotations omitted).  However, "[n]ot all actions by state employees are acts under color of law."  Edwards v. Wallace Community College, 49 F.3d 1517, 1523 (11th Cir. 1995).  Rather, "[t]he dispositive issue is whether the official was acting pursuant to the power he/she possessed by state authority or acting only as a private individual."  Id. (citing Monroe v. Pape, 365 U.S. 167, 184 (1961)).  Merely private conduct, however wrongful or discriminatory, is not actionable under § 1983.  Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1266-67 (11th Cir. 2003).

14

In this case, neither Andrew nor Deborah Williams are *per se* state actors.  That is, neither of them were authorized under any state law to engage in the conduct of which the Plaintiff complains.  It is undisputed that Deborah Williams has been and continues to be a private citizen - she has never worked for the Lake County Sheriffs Office, the Town of Lady Lake Police Department, or any other state agency.  As for Andrew Williams, while he is a state employee by virtue of his employment with the Orange County Sheriffs Office, he could not have performed any of the alleged acts under the authority he possessed from his state employer.  The Plaintiff agrees that at all relevant times, the power Andrew Williams possessed by virtue of his employment as an Orange County deputy sheriff was limited solely to the geographical confines of Orange County.[14]  In other words, Andrew Williams had no state authority or power while he was in Lake County.[15]

Moreover, even if Andrew Williams' state powers extended to his residence in Lake County, the facts which the Plaintiff points to in support of his claims did not involve the use of Williams' state authority or position.[16]  Andrew Williams' status as a deputy sheriff had no bearing on his conduct; he could have engaged in the exact same conduct if he was

---

[14]See Woods Dep., pp. 54-55, 57, 270-71.

[15]See Affidavit of Daniel W. Ford, ¶¶ 4-6, (Doc. 93-7).

[16]See, e.g. , Almand v. DeKalb County, Ga., 103 F.3d 1510, (11th Cir.1997) (finding police officer who broke into plaintiff's home and raped her was not acting under color of state law for purposes of § 1983 liability); cf., Woodward v. City of Worland, 977 F.2d 1392, 1400 (10th Cir. 1992) (declining to find liability under § 1983 against police officers who engaged in sexual harassment against co-employee where there harassment did not involve use of state authority or position).

15

employed by a non-state entity or unemployed.   Rather, it is clear that Andrew and Deborah Williams were acting as private citizens when they allegedly threatened the Plaintiff and sought to protect their home.  See Woodward, 977 F.2d at 1401.

This does not end the analysis, as the Plaintiff also argues that Andrew and Deborah Williams, in their roles as private citizens, worked together with state officials to violate the Plaintiff's Constitutional rights.  "Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes."  Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992).  For a private party to be considered a state actor, one of three conditions must be met: (1) the state has coerced or at least significantly encouraged the action alleged to violate the Constitution (the state compulsion test); (2) the private party performed a public function that was traditionally the exclusive prerogative of the state (the public function test); or (3) the state had so far insinuated itself into a position of interdependence with the private party that it was a joint participant in the enterprise (the nexus/joint action test).  Rayburn ex rel. Rayburn v. Hogue, 241 F.3d 1341, 1347 (11th Cir. 2001).

The Plaintiff has presented no evidence to support any of these three tests.  There is no evidence, nor has the Plaintiff even alleged, that any state authority coerced or significantly encouraged Andrew and Deborah Williams to violate the Plaintiff's Constitutional rights.  Likewise, there is no evidence that Andrew or Deborah Williams

performed any public function traditionally within the prerogative of either the Lake County Sheriffs Office or the Town of Lady Lake Police Department.[17]

The Plaintiff unsuccessfully argues that Andrew and Deborah Williams fall within the nexus/joint action test for state actors.  Under that test, "the governmental body and private party must be intertwined in a symbiotic relationship," which must involve the "specific conduct of which the plaintiff complains."  Rayburn, 241 F.3d at 1348 (quoting National Broad. Co., Inc.  v. Communications Workers of Am., AFL-CIO, 860 F.2d 1022, 1026-27 (11th Cir. 1988), and American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 51 (1999)).  For example, the Eleventh Circuit has held that the nexus/joint action test is satisfied where the state contractually requires a private actor to take certain actions, such that the private actor is acting in accordance with the governmental directive and is effectively the surrogate for the state.  See Focus, 344 F.3d at 1278-70.  Absent such clear evidence of the requisite nexus, it is a daunting task for a plaintiff to show that the state and a private actor were engaged in joint action sufficient to trigger state actor liability under § 1983 for the private entity's conduct.  See Weaver v. James Bonding Co., Inc., 442 F. Supp. 2d 1219, 1225, n. 8 (S. D. Ala. 2006).

The particular conduct in question here involves threats, false police reports, obtaining a false injunction, and a false complaint that the Plaintiff violated the injunction.

---

[17]See, e.g., White v. Scrivner Corp., 594 F.2d 140, 142 (5th Cir. 1979) (arrest, detention and searches are not exclusively reserved to the states); Weaver v. James Bonding Co., 442 F. Supp. 2d 1219, 1224 (S.D. Ala. 2006) (same).

Other than the Plaintiff's own unsupported beliefs and vague conclusions, there is not a shred of evidence that any state authority, or any of the Officer Defendants encouraged any of this conduct, or acted as joint participants in this conduct.[18]   The facts as presented by the Plaintiff, taken as true, simply do not support any allegation that Andrew and Deborah Williams were anything except private citizens seeking to protect their home from allegedly hostile neighbors.[19]

Because Andrew and Deborah Williams are private citizens, and because the Plaintiff has not presented any facts establishing that their private actions rise to the level

_____

[18]None of the Officer Defendants filed any of the prior police reports, or assisted in obtaining the injunction.  Although the Plaintiff contends that each Defendant made the exact same threat against him at various points in time, this does not establish that all of the Defendants were acting as part of a joint enterprise.  Nor does it establish that the threats were made using the authority of the State.

[19]The Plaintiff appears to argue that simply filing police reports and/or seeking an injunction through the court system automatically turns a private citizen into a state actor. That is not the case.  Private entities do not transform themselves into state actors simply by calling the police. See Williams v. Town of White Hall, Alabama, 450 F. Supp. 2d 1300, 1308 (M.D. Ala. 2006); Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1450 (10th Cir. 1995).  Likewise, "use of the courts by private parties does not constitute an act under color of state law."  Harvey, 949 F.2d at 1133.  In particular, obtaining temporary restraining orders from state courts does not constitute action under color of state law.  Cobb v. Georgia Power Co., 757 F.2d 1248, 1251-52 (11th Cir. 1985).  If the Plaintiff's argument were taken as true, then any time any person ever filed a police report, made a criminal complaint against another person, or attempted to protect his or her rights in court, that person would become a state actor.  Drawing the Plaintiff's argument to its natural conclusion, the Plaintiff and his mother would be state actors subject to § 1983 liability, as they also filed numerous police reports and requested an injunction against both Andrew and Deborah Williams.

of state action, Andrew and Deborah Williams are entitled to summary judgment on all claims against them.[20]

II.    Claims Against the Officer Defendants

The Plaintiff has alleged seven claims under § 1983 against each of the four Officer Defendants, claiming various violations of his Fourth and Fourteenth Amendment rights. The Officer Defendants seek summary judgment as to each claim. The Court will address each claim in turn.

A.    Count I - Illegal Unreasonable Seizure and/or Entry

The Plaintiff first claims that the Officer Defendants illegally entered his home and arrested him without a warrant or exigent circumstances, in violation of his Fourth Amendment rights. Each of the Officer Defendants argue that they are entitled to summary judgment because their actions did not violate clearly established law, and therefore they are protected by the doctrine of qualified immunity.[21] Given the numerous genuine issues of material fact that exist with respect to this claim, the Court must disagree.

---

[20]Although the Court reads the Plaintiff's Second Amended Complaint to only allege claims of First Amendment retaliation and Fourteenth Amendment substantive due process violations against Andrew and Deborah Williams, it bears noting that the fact that Andrew and Deborah Williams are not state actors would also defeat any of the other five claims in this lawsuit.

[21]Defendant Turner also argues that he is entitled to summary judgment because Fla. Stat. § 901.15(6) permits the warrantless arrest of a person when an officer has probable cause that the person violated an injunction for protection, such as the one entered against the Plaintiff. This argument is without merit because the Plaintiff's claim does not focus solely on his arrest, but on the Officer Defendant's alleged entry into his home without a warrant, which is not permitted under Florida law, or under the Fourth Amendment. See Fla. Stat. § 901.19 (limiting the instances where an officer can make a warrantless entry into a building to felony arrests only).

The purpose of qualified immunity is "to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." Lee v. Ferraro, 284 F.3d 1198, 1194 (11th Cir. 2002).  To receive qualified immunity, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Id. (citation and internal quotation marks omitted).  Because it is undisputed that the Officer Defendants were acting within the course and scope of their discretionary authority when they arrested the Plaintiff, the burden now shifts to the Plaintiff "to show that qualified immunity is not appropriate." Id.

At the summary judgment stage, the Court must use a two-step process to determine whether the Plaintiff has met his burden.  First, the Court must decide whether the facts alleged, taken in the light most favorable to the Plaintiff, demonstrate that the Officer Defendants' conduct violated a constitutional right. See Saucier v. Katz, 533 U.S. 194, 201 (2001).  In evaluating the claimed violation, the Court must apply present-day law. McClish v. Nugent, ___ F.3d ___, 2007 WL 1063337, * 4 (11th Cir. Apr. 11, 2007).

Assuming the Plaintiff meets this first step, then the Plaintiff must show that the right violated was clearly established. Saucier, 533 U.S. at 201.  "Clearly established" for purposes of qualified immunity means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the highest court of the pertinent state, in this case the Supreme Court of Florida, can clearly establish the law. See Marsh v.

Butler County, 268 F.3d 1014, 1032, n. 10 (11th Cir. 2001) (en banc).  Moreover, the law clearly establishing the violation must have been in effect at the time of the alleged violation.  Hope v. Pelzer, 536 U.S. 730, 741 (2002).

Here, the Plaintiff alleges his Fourth Amendment rights were violated when the Officer Defendants entered his home without a warrant to arrest him.  The Fourth Amendment protects "against unreasonable searches and seizures" and requires that warrants only be issued "upon probable cause."  U.S. Const., Amend. IV.  The arrest of a person clearly falls within the Fourth Amendment's protections against unreasonable seizures.  California v. Hodari D., 499 U.S. 621, 624 (1991).  Since at least 1980, it has been clearly established law that a nonconsensual entry into a person's home in order to make an arrest must be supported with a valid arrest warrant; probable cause alone is not enough.  Payton v. New York, 445 U.S. 573, 576, 589-90 (1980).  Four years later, the Supreme Court applied Payton to invalidate warrantless misdemeanor arrests within the home.  Welsh v. Wisconsin, 466 U.S. 740 (1984).  Thus, it is "a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."  Payton, 445 U.S. at 586.

Since it is undisputed that the Officer Defendants entered the Plaintiff's home and arrested him within his home, it would appear that his Fourth Amendment rights were violated, thereby satisfying the first part of the Plaintiff's burden under the qualified immunity analysis.  However, the Officer Defendants contend that there was no constitutional violation because: (1) they had probable cause to arrest the Plaintiff; and (2)

21

exigent circumstances existed both because the Officer Defendants were in hot pursuit of the Plaintiff who was hiding behind the front door, and because the Plaintiff was struggling with and attempting to physically harm Deputy Turner.[22]  The Officer Defendants' reliance on probable cause is without merit - as discussed above, when an arrest takes place within the confines of a person's home, probable cause alone is not sufficient to prevent a constitutional violation.

The other two issues - hot pursuit and exigent circumstances - merit further analysis. The Supreme Court in Payton recognized that a warrantless arrest may nevertheless by valid if exigent circumstances exist. Id. at 589-90.  The Eleventh Circuit has defined exigent circumstances as "situations in which 'the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action.'" McClish, 2007 WL 1063337 at * 8 (quoting United States v. Burgos, 720 F.2d 1520, 1526 (11th Cir. 1983)).   Exigent circumstances that permit warrantless entries include: breaking up a violent fight, preventing the destruction of evidence, putting out a fire in a burning building, attending to a stabbing victim, rescuing a kidnapped infant, or pursuing a fleeing suspect.  See McClish, 2007 WL 1063337 at * 8 (citations omitted).

––––––––––––––––

[22]See Welsh, 466 U.S. at 750 ("Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries.").

The Officer Defendants point to two of these exigent circumstances: hot pursuit and breaking up a violent fight.[23]  According to the Officer Defendants, they were authorized to enter the Plaintiff's home to arrest him because once the front door was opened, he attempted to flee by hiding behind the door and pushing the door closed. See United States v. Santana, 427 U.S. 38 (1976).  The Officer Defendants also contend that they entered the Plaintiff's home to break up a violent fight between the Plaintiff and Deputy Turner - the Plaintiff violently resisted his arrest and the arrest of his mother, and attempted to cause physical harm to Deputy Turner by slamming the front door on his arm.

In contrast, the Plaintiff argues that the Officer Defendants broke down the front door in order to enter the house and arrest the Plaintiff and Della Woods.  No one opened the front door first, and no one consented to the Officer Defendants' admittance.  The Officer Defendants then crossed the threshold of the Plaintiff's home, struggled with the Plaintiff, pinned him behind the front door, and pepper sprayed him.  Other than attempting to get out from behind the door, the Plaintiff did not attempt to run or hide, and he did not attack Deputy Turner or otherwise become violent.

It is quite obvious to the Court that these two strongly divergent versions of events generate numerous genuine issues of material fact as to whether exigent circumstances

---

[23]There were no other exigent circumstances; the Officer Defendants engaged in discussions with the Plaintiff, Della Woods, and each other for approximately two hours prior to arresting the Plaintiff, and there was no risk that the Plaintiff was destroying any evidence.  See also Welsh, 466 U.S. at 750 ("Our hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor.").

Case 5:05-cv-00394-WTH-GRJ   Document 133   Filed 05/14/07   Page 24 of 47 PageID 1754

existed at the time of the Plaintiff's arrest. The Court cannot resolve these factual disputes without accepting one side's version of the facts and ignoring the others' completely. More specifically, the Court would have to afford more credibility and weight to one witness' testimony than another's, which would run afoul of both the summary judgment standard of review, and the standard of review for analyzing qualified immunity.[24] See Saucier, 533 U.S. at 201; Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005). These credibility determinations must be made by the trier of fact; and therefore the Court cannot determine, as a matter of law, whether the Plaintiff's Fourth Amendment rights were violated.

The Officer Defendants also argue that even if the Plaintiff's Fourth Amendment rights had been violated, the law governing the warrantless arrest of a person in his home under similar circumstances was not clearly established at the time of the Plaintiff's arrest. If the Court were to agree with the Officer Defendants, then it would appear that they would still be entitled to summary judgment.

Each of the Officer Defendants has sought leave to supplement their summary judgment papers in order to focus the Court's attention on the Eleventh Circuit Court of Appeals' very recent decision in McClish. See Docs. 126-129. In McClish, the Eleventh Circuit found that the plaintiff's Fourth Amendment rights were violated when the police

---

[24]The Officer Defendants urge the Court to focus solely on Della Woods' videotaped statements made while she was sitting in a patrol car, after her arrest. Aside from the fact that Della Woods now strongly refutes those statements, the Court cannot, at this time, give them more weight than the testimony of any other eye-witness. Moreover, whether or not the door was opened or broken down would not conclusively establish whether a Fourth Amendment violation took place, as it is undisputed that no one gave the Officer Defendants consent to enter the home.

24

officers effectuated a warrantless arrest by knocking on the plaintiff's front door, and pulling him out of his home once he opened his front door.  2007 WL 1063337 at ** 9-15.  The Eleventh Circuit nevertheless affirmed the district court's finding that the arresting officer was entitled to qualified immunity on the grounds that the law governing warrantless arrests in such situations was not clearly established at the time.  Id. at ** 14-16.  In particular, the Eleventh Circuit found a conflict between the Supreme Court's decisions in Payton, which set forth a bright-line rule prohibiting officers from crossing the threshold of a persons' home without a warrant; and Santana, 427 U.S. 38, which permits police officers in hot pursuit to enter a person's home without a warrant, where "a person, while standing firmly inside the house, opens the door in response to a knock from the police and is then pulled outside the unambiguous physical dimensions of the home." McClish, 2007 WL 1063337 at * 16.  In other words, the Eleventh Circuit has found that prior to 2007, the law was not clearly established in situations where a person voluntarily opens his or her front door, is within arms' reach of the police officer, and is dragged from his or her home.

If such circumstances existed here, then qualified immunity would be appropriate. However, the same factual discrepancies which prevent the Court from finding a violation of the Fourth Amendment also preclude the application of McClish.  It is the Officer Defendants' position that either Matthew or Della Woods opened the front door in response to a request by Deputy Turner, and that they were in arms' reach of the Plaintiff at the time of his arrest.  Such a situation would closely mirror that of McClish.  Under the Plaintiff's version, it would appear that Payton and only Payton would apply - the Officer Defendants

broke down the front door to arrest the Plaintiff, without any exigent circumstances, and entered the Plaintiff's home.  If the Plaintiff's version holds true, then no reasonable officer would have understood that his or her actions were constitutional, and qualified immunity would not exist.  Given these factual discrepancies, the Court simply cannot find that the Officer Defendants are entitled to summary judgment on the grounds of qualified immunity. See, e.g. Lepone-Dempsey v. Carrolll County Com'rs, 159 Fed. Appx. 916, 2005 WL 3455821 (11th Cir. Dec. 16, 2005).

Lastly, the Officer Defendants argue that they are entitled to summary judgment under Heck v. Humphrey, 512 U.S. 477 (1994), because the Plaintiff pleaded *nolo contendre* to the claim of criminal mischief.  In Heck, the Supreme Court found that if a judgment in a § 1983 action that is based on an underlying criminal conviction "would necessarily imply the invalidity of his conviction or sentence, . . . the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated."  512 U.S. at 487.  In other words, § 1983 actions that would be "construed as seeking a judgment at odds with [a plaintiff's] conviction" cannot go forward under Heck.  Muhammad v. Close, 540 U.S. 749, 754-55 (2004).

In this case, two of the three misdemeanor charges against the Plaintiff - resisting an officer without violence and violation of the injunction - were dismissed.  The Plaintiff pleaded *nolo contendre* to the charge of criminal mischief, and has not sought to have that

conviction overturned or otherwise invalidated.[25]  Because the Plaintiff's conviction on the charge of criminal mischief has not been invalidated, the Officer Defendants' argue that the Plaintiff cannot proceed with his § 1983 claim, because to do so would necessarily imply that his conviction was invalid.

What the Officer Defendants fail to note is that the charge of criminal mischief involved facts that took place well after the Plaintiff's initial arrest.  It is undisputed that the criminal mischief charge arose separate and apart from the Plaintiff's arrest - it involves allegations that the Plaintiff damaged the ambulance he was riding in while en route to the hospital.  That charge has nothing to do with the incidents which formed the basis for the Plaintiff's arrest.  Moreover, the Officer Defendants have provided no legal support for their position that Heck should apply under this set of circumstances.  Thus it would appear that challenging the Plaintiff's arrest would not implicate any of the facts surrounding his conviction for criminal mischief, and therefore Heck does not apply to bar the Plaintiff's claims.[26]  See, e.g., Pittman v. Tucker, No. 06-11454, 2007 WL 62606 (11th Cir. Jan. 9, 2007) (§ 1983 claims are not barred where there is no indication that a judgment in

---

[25]A plea of *nolo contendre* is recognized as the equivalent of a guilty plea in Florida.  See Fla. R. App. P. 9.140(b)(2).

[26]Olsen and Butz also argue they are entitled to summary judgment because they did not participate in the Plaintiff's arrest.  Given the numerous factual disputes surrounding the Plaintiff's arrest, including conflicting statements in both the Plaintiff's deposition and among the Officer Defendants' affidavits and police reports, the Court cannot decide, as a matter of law, that Olsen and Butz did not participate on some level.  At the very least, it appears that they entered the Plaintiff's house at the time Della Woods was arrested.

plaintiff's favor would necessarily imply the invalidity of his conviction or sentence). Summary Judgment on Count I is therefore denied.

### B. Count II - Excessive Force In Arrest

The Plaintiff's second claim alleges that the Officer Defendants used excessive force when arresting him, breaking his left wrist, and causing permanent damage to his right foot and ankle.  In addition to arguing that they did not injure the Plaintiff, these Defendants argue that they are entitled to qualified immunity. In particular, they argue that any force used to subdue and arrest the Plaintiff was both reasonable and *de minimus* in nature.

To assert a violation of the Fourth Amendment for the use of excessive force, the Plaintiff must allege that a seizure occurred and that the force used to effect the seizure was unreasonable. Troupe v. Sarasota County, Fla., 419 F.3d 1160, 1166 (11th Cir. 2005). While some force is permissible in making an arrest, a constitutional violation occurs when the officers' use of force is "objectively unreasonable" in light of the totality of the circumstances at the time the force is used.   Graham v. Connor, 490 U.S. 386, 396-97 (1989).  See also Rodriguez v. Farrell, 280 F.3d 1341, 1351 (11th Cir. 2002) ("the typical arrest involves some force and injury.").   Whether the force used is "objectively unreasonable" turns on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Thornton v. City of Macon, 132 F.3d 1395, 1400 (quoting Graham, 490 U.S. at 396).  The Court also considers the relationship between the need and the amount

of force used, and the extent of any injury to the suspect.  <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1197-98 (11th Cir. 2002).

The Court cannot find in favor of the Officer Defendants as to this claim.  The same factual discrepancies which exist to defeat summary judgment on the Plaintiff's claim for false arrest and entry also defeat summary judgment on this claim.  <u>See</u> <u>Jackson v. Sauls</u>, 206 F.3d 1156, 1172 (11th Cir. 2000).  If the Officer Defendants' version of the facts proves true, then they had probable cause, as well as exigent circumstances both for arresting the Plaintiff and entering his home.  They also used appropriate force to subdue the Plaintiff who was struggling with the Officers and attempting to prevent Della Woods' arrest.

On the other hand, accepting the Plaintiff's version of the facts as true, a reasonable jury could find that the Officer Defendants' actions constituted unlawful excessive force. The Plaintiff was not suspected of having committed a serious crime, did not pose an immediate threat to anyone, and did not actively resist arrest. Yet, the Officer Defendants pinned him behind a solid steel door, breaking his wrist and injuring his foot and toes, grabbed him by the hair and coated his face and body with pepper spray.  Assuming these facts are true, a reasonable officer should have known that using such force to effect a misdemeanor arrest in this situation would be impermissible.  In addition, these actions resulted in injuries that cannot be said to be *de minimus* - the Plaintiff suffered a broken

wrist which ultimately required surgery, as well as permanent injuries to his right foot - facts which the Defendants do not even attempt to dispute.[27]

These factual disputes also prevent a finding that the Officer Defendants are entitled to qualified immunity.  In this Circuit, "[a]n officer will be entitled to qualified immunity if his actions were objectively reasonable - that is, if a reasonable officer in the same situation would have believed that the force used was not excessive."  Thornton, 132 F.3d at 1400; see also  Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002).  Under the Plaintiff's version of the facts, no reasonable officer would have believed that his or actions did not violate clearly established law.[28]

While it may well prove true that the officers involved used reasonable and minimal force - and indeed the Court has serious doubts as to whether the Plaintiff will be ultimately successful at trial - the Court simply cannot make that decision at this stage.[29]   Almost

---

[27]See, e.g., Davis v. Williams, 451 F.3d 759, 767 (11th Cir. 2006) (arrest which resulted in torn rotator cuff, numbness to thumb and sore neck created material issue of genuine fact as to whether the force used was excessive); Schultz v. Hall, 365 F. Supp. 2d 1218, 1226 (N.D. Fla. 2005) (finding hairline fracture of plaintiff's arm which was caused during handcuffing process during arrest constituted more than a *de minimus* injury.).  In contrast, all of the decisions the Officer Defendants cite refer to minor injuries such as soreness, minor bruises or cuts.  See .e.g Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000); Edwards v. Giles, 51 F.3d 155 (8th Cir. 1995).  Those decisions are readily distinguishable from the present case and are therefore not persuasive.

[28]The Court need not focus on the second prong of the qualified immunity analysis, as it was clearly established law at the time of the Plaintiff's arrest that the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment.  Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 1998) (citing Graham v. Connor, 490 U.S. 386, 394 (1989)).

[29]Defendants Olsen and Butz also argue that they are entitled to summary judgment
(continued...)

every single fact which forms the basis of this claim, as well as the Officer Defendants' qualified immunity defense, is in dispute.  It is the role of the jury, not the Court, to weight the credibility of each witness and resolve these factual disputes.  Accordingly, summary judgment on Count II is denied.

C.    Count III - False Probable Cause Affidavit

In Count III of the Plaintiff's second amended complaint, he alleges that Defendant Olsen "willfully and knowingly made at le[a]st Two (2) false statements in his probable cause affidavit to arrest the Plaintiff," and that these false statements constitute a violation of the Plaintiff's Fourth Amendment rights.  Second Am. Compt. ¶ 38.  Summary judgment in Olsen's favor is appropriate on this claim because, as the undisputed facts show, Olsen did not draft the probable cause affidavit for the Plaintiff's arrest.  Instead, Olsen drafted the probable cause affidavit for Della Woods.[30]  Valentino drafted and signed the probable cause affidavit for Matthew Woods,[31] and the Plaintiff has not submitted any evidence that Olsen played any role in preparing or submitting any affidavit for his arrest. Accordingly, Olsen is entitled to summary judgment on Count III.

D.    Count IV - False Probable Cause Affidavit

---

[29](...continued)
because they did not participate in any manner in the Plaintiff's arrest.  Again, the facts are not entirely clear, and it is in dispute as to whether and to what extent Olsen or Butz entered the Plaintiff's home, assisted in pushing the door open, or had any physical contact with the Plaintiff. These disputes can only be resolved at trial.

[30]See Olsen Aff., ¶ 11.

[31]See Valentino Aff., ¶ 7, Exhibit 8.

The Plaintiff's fourth claim is asserted against Valentino, and alleges that Valentino deliberately fabricated the probable cause affidavit for the Plaintiff's arrest by stating in the narrative section that the Plaintiff "violated a protected injunction by having non verbal contact by placing signs with the co-defendant [Della Woods] in their yards facing the protected party residence."[32]  According to the Plaintiff, Valentino knew at the time of the Plaintiff's arrest that only Della Woods had placed the signs on the Plaintiff's property.

In order to prevail on this claim, the Plaintiff would have to establish that Valentino's probable cause affidavit contained deliberately false statements or that Valentino acted with a reckless disregard for the accuracy of the affidavit.  See Dahl v. Holley, 312 F.3d 1228, 1235 (11th Cir.2002); Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir.1997); Kelly v. Curtis, 21 F.3d 1544, 1554 (11th Cir.1994).  The Plaintiff cannot meet this burden. He has presented no evidence, other than his own unsupported beliefs, that Valentino deliberately or recklessly misstated the evidence or omitted any material fact which would negate a finding of probable cause.  There is simply no record evidence that at the time of the Plaintiff's arrest, any of the officers - including Valentino - were aware that the Plaintiff had not erected the signs on his yard in violation of the injunction.[33]  Given the fact that the

---

[32]See Valentino Aff., ¶ 7, Exhibit 8; see also Second Amended Complaint, ¶ 46.

[33]The Plaintiff makes mention of a deposition by Deborah Williams where she supposedly stated that she told the officers that Della Woods erected the signs.  This mystery deposition has never been presented to the Court.  The only evidence the Court has are the Officer Defendants' affidavits stating that they did not learn the exact identity of the person who put the signs up until after the Plaintiff's arrest, and the affidavit of Deborah Williams stating that she "saw signs on the Woods property facing my residence."

signs were located within the Plaintiff's property, that the Plaintiff was the sole owner of the property, and that the Plaintiff removed the signs upon request by the Officer Defendants, it is reasonable to assume that the Plaintiff either put the signs there to begin with, assisted with their placement, or gave his consent to their placement.  Accordingly, the Court finds that there are no deliberately false statements in Valentino's probable cause affidavit, and he did not act with reckless disregard for the truth.  Valentino is entitled to summary judgment on this claim.

E.    Count V - Excessive Force

The Plaintiff's fifth claim is a Fourth Amendment excessive force claim asserted against Olsen, focusing on his alleged beating of the Plaintiff's previously injured right foot and ankle after the Plaintiff had been placed in handcuffs and was awaiting medical treatment.  Olsen vehemently denies ever hitting the Plaintiff at any time before, during or after his arrest, and requests summary judgment.

In support of his position, Olsen has submitted the affidavit of Defendant Butz, who avers that she never saw Olsen strike the Plaintiff.[34]  Olsen has also submitted the affidavits of the two Lake County Fire Rescue workers who evaluated the Plaintiff at the scene, and upon whose EMT van Matthew Woods was seated during the alleged attack. Lt. Robert Ford and Lt. Tony Cuellar both state under oath that the Plaintiff complained of pain to a toe on his right foot, and that they examined the Plaintiff and stayed with him until

---

[34]See Butz Aff., ¶ 7.

the ambulance arrived to transport him to the hospital.[35]  During that entire time, Ford and

Cuellar never saw Olsen or any other officer hit the Plaintiff.[36]  Olsen urges the Court to rely

on the affidavits of Ford and Cuellar and grant summary judgment.

Although the Court has serious doubts as to the success of this claim at trial, it is

nevertheless clear that there are genuine issues of material fact which preclude summary

judgment.  The resolution of this claim, like the first two claims in this case, centers solely

on the weight and credibility afforded to each witness - a classic "he said/he said" analysis.

The fact that Olsen has submitted affidavits from two other witnesses does not change the

analysis.  For the Court to grant summary judgment, it would have to find that the two EMT

witnesses were more credible and trustworthy than the Plaintiff, particularly when there is

no dispute that the Plaintiff was, in fact, injured.  These credibility determinations are for

the jury to decide.  They also preclude a finding on the question of qualified immunity: if the

Plaintiff's version is found to be true, qualified immunity would not apply as it is clearly

established law that the use of force on an arrestee after he has been placed in handcuffs

---

[35]See Affidavit of Lt. Robert Ford ("Ford Aff."), ¶ 4; Affidavit of Lt. Anthony Cuellar ("Cuellar Aff."), ¶ 4.  (Docs. 96-7, 96-8).

[36]Ford Aff., ¶ 5; Cuellar Aff., ¶ 5.

violates the Fourth Amendment.[37]   Accordingly, Summary Judgment on Count V is denied.[38]

F.   Count VI - First Amendment Retaliation

The Plaintiff next claims that the Officer Defendants retaliated against him for his November 24, 2002 newspaper opinion article, in violation of his First Amendment rights. In particular, he alleges that the Officer Defendants made several comments to him to the effect that they did not like his newspaper article, and that his February 23, 2003 arrest was in retaliation for that article.[39]   See Second Amended Complaint, ¶¶ 20, 62.   The Officer Defendants contend that the Plaintiff has not established a *prima facie* case of First Amendment retaliation.[40]   The Court agrees.

The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that

---

[37]See, Lee, 284 F.3d at 1998 (finding excessive force during the plaintiff's arrest where, after she was handcuffed, the officer slammed her head against the car trunk and spread her legs with his foot); Slicker v. Jackson, 215 F.3d 1225, 1233 (11th Cir. 2000) (kicking the plaintiff in the ribs and beating his head on the ground, after the plaintiff was arrested and handcuffed and did not struggle against or resist the officers, was sufficient to raise a question of material fact as to whether the officers' actions constituted excessive force.).

[38]Olsen might have had more success on this claim if he had produced the Plaintiff's medical records or some other documentary evidence demonstrating the lack of any injuries. Because Olsen has not done so, the Court is left with the testimony of the Plaintiff, under oath, which, albeit thin, describes several permanent injuries which cannot be considered *de minimus*.

[39]The Plaintiff also claims that the Williams Defendants obtained their injunction against the Plaintiff in retaliation for his newspaper article.  Because the Court has previously found that the Williams Defendants are not state actors, the Court will not address this portion of the Plaintiff's claim.

[40]The Officer Defendants have not asserted a defense of qualified immunity.

right.  Ratliff v. DeKalb County, Ga., 62 F.3d 338, 340 (11th Cir. 1995).  The Eleventh Circuit has adopted a three-part test for determining whether a plaintiff has an actionable First Amendment retaliation claim: (1) that his speech or act was constitutionally protected; (2) that the defendants' retaliatory conduct adversely affected the protected speech; and (3) that there is a causal connection between the retaliatory actions and the adverse effect on speech.  Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005).  The Plaintiff need not show that his own exercise of his First Amendment rights have been adversely affected.  Rather, "[a] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of his First Amendment rights."  Id. at 1254.  However, the conduct must be more than a "de minimus inconvenience."  Id. at 1252.

Although there is no dispute that the Plaintiff's newspaper opinion article constitutes protected speech, the Officer Defendants argue that the Plaintiff has not satisfied the other two prongs of the Bennett test.  With respect to the various alleged comments concerning the Plaintiff's newspaper article, the Court agrees that the alleged comments, if made, would not rise to the level of retaliatory conduct.  They are simply statements that the Officer Defendants did not like the article; they did not threaten the Plaintiff with physical violence or any other consequences.  It is not even entirely clear when and how often the statements were made.  Thus, the Court does not believe that these statements, by themselves, would likely deter a person of ordinary firmness from the exercise of his First

Amendment rights.  See, e.g. Pittman v. Tucker, Case No. 06-11454, 2007 WL 62606, * 3 (11th Cir. Jan. 9, 2007).

The same analysis holds true for the Plaintiff's arrest.  Taking the Plaintiff's version of the facts as true, the Officer Defendants entered the Plaintiff's home and arrested him without a warrant, causing him permanent physical injury.   While this is more than a mere "de minimus" inconvenience, the Plaintiff has not produced any record evidence establishing either that a person of ordinary firmness would be deterred from writing additional newspaper opinion pieces based on an arrest on completely unrelated charges, or that a causal connection exists between his arrest and his article.  The only "evidence" the Plaintiff has presented is one statement in his response in opposition to Defendant Turner's motion for summary judgment, in which the Plaintiff states in conclusory form that Turner "punished the plaintiff for his free speech," and that Turner said he did not like the Plaintiff's newspaper article.[41]

While the Plaintiff alleges in his Second Amended Complaint that the Officer Defendants told him that his arrest was in retaliation for his article,[42] he has not presented any evidence to support that claim.  The Court has carefully reviewed the Plaintiff's deposition testimony, his affidavits, and his responses to each of the Officer Defendants'

---

[41]See Doc. 109, pp. 1, 3.

[42]According to the Plaintiff, the Officer Defendants told him "this is what you get for your mother suing the Town of Lady Lake and this is for your 'fucking' newspaper article.  Your gonna see how we can lie about you in court and you cant sue us for defamation, slander you can't do a thing about it."  Second Amended Complaint, ¶ 62.

motions for summary judgment, and there is simply no evidence whatsoever demonstrating that any of the Officer Defendants acted with a retaliatory animus.  To the contrary, each Officer Defendant has submitted sworn testimony that they did not read and were not even aware of the newspaper article until after this lawsuit had been filed, and the Plaintiff has not been able to refute this testimony.[43]   Summary judgment is therefore due to be granted as to this claim.  See Farrow v. West, 320 F.3d 1235 (11th Cir. 2003) (affirming summary judgment on First Amendment retaliation claim where defendant submitted affidavit stating that she had no knowledge of the protected speech and plaintiff offers no evidence in rebuttal).

G.    Count VII - Substantive Due Process

The Plaintiff's seventh and final claim alleges that the Officer Defendants' violated his Fourteenth Amendment substantive due process rights.  The Plaintiff bases this claim on the following allegations:[44] (1) the Officer Defendants' warrantless entry into the Plaintiff's home and arrest of the Plaintiff; (2) the Officer Defendants' use of excessive force both during and after the Plaintiff's arrest; (3) the Officer Defendants' threats at the time of

_____

[43]The Plaintiff cannot defeat summary judgment by resting solely on the allegations in his Second Amended Complaint.  See Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").  Although the Plaintiff is proceeding pro se, the Court cannot ignore the standards governing summary judgment particularly where, as here, the Plaintiff has proven himself to be well-versed in both the applicable substantive and procedural law.

[44]The Court will not address any of the allegations as they pertain to the Williams Defendants as they were not acting under color of state law.

his arrest that the next time they broke into the Plaintiff's home they would kill him and that the Plaintiff "better move [his] ass out of Town;" (4) the Officer Defendants' comments that they did not like the Plaintiff's November 24, 2002 newspaper opinion article; and (5) additional random threats by the Officer Defendants that they would make the Plaintiff's life "hell and/or that Plaintiff would be killed" if he did not move from his home.  See Second Amended Complaint, ¶¶ 19-20, 23, 69-72.  As damages, the Plaintiff contends that he has lost enjoyment of life, lost "democracy," is "being subject to communist regime tactics and abuse," and that his "right to live without government actors . . . threatening the plaintiff with 'death' and/or illegally taking the plaintiff's liberty" has been violated.  Id., ¶ 73.

"The substantive due process component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'" Greenbriar Village, LLC v. Mountain Brook, City, 345 F.3d 1258, 1262 (11th Cir. 2003) (quoting McKinney v. Pate, 20 F.3d 1550, 1556 (11th Cir. 1994)).  It is intended "to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" DeShaney v. Winnebago County Dept. Of Social Services, 487 U.S. 189, 196 (1989) (quoting Davidson v. Cannon, 474 U.S. 344, 348 (1986)).

The process for analyzing a substantive due process claim is two-fold.  First, the Court considers whether the Plaintiff has alleged a deprivation of a right that is, objectively, "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Williams v. Attorney Gen. of Ala., 378 F.3d 1232, 1239 (11th Cir. 2004).  Next, the Plaintiff must

39

provide a "careful description" of the fundamental right.  Reno v. Flores, 507 U.S. 292, 302

(1993).   The Plaintiff can meet this burden by demonstrating that the alleged conduct

"shocks the conscience" or constitutes force that is so "brutal" as to "offend even hardened

sensibilities."   Rochin v. California, 342 U.S. 165, 172 (1952); see also County of

Sacramento v. Lewis, 523 U.S. 833, 846-47 (1998); Everett v. Napper, 833 F.2d 1507,

1513 (1987).

As an initial matter, the Plaintiff cannot seek relief under a Fourteenth Amendment

substantive due process theory for his arrest and claims of excessive force; those claims

as alleged fall squarely within the protections of the Fourth Amendment and thus can only

be brought under that Amendment.  Albright v. Oliver, 510 U.S. 266, 274-75 (1994).  Where

a particular Amendment "provides an explicit textual source of constitutional protection"

against a type of government behavior, "that Amendment, not the more generalized notion

of 'substantive due process,' must be the guide for analyzing these claims."  Graham v.

Connor, 490 U.S. 386, 395 (1989).

This leaves a substantive due process claim based on the Officer Defendants'

alleged  threats to do bodily harm to the Plaintiff and/or kill him if he did not move, and the

Officer Defendants' comments that they did not like his newspaper article.  The Plaintiff

contends that these alleged threats and comments violated his fundamental right to

personal liberty, including the right to be free from threats of bodily harm or death.  No on

has disputed that the right to personal liberty is a fundamental right, however the Court

agrees with the Officer Defendants that the Plaintiff has not shown that these threats and

comments "shock the conscience" such that substantive due process relief is warranted.

Although the Court has not located any case law directly on point in this Circuit, (and the Plaintiff has not provided any), several other Circuits have held that verbal threats and harassment by a governmental official do not generally violate substantive due process.[45] See, e.g, King v. Olmsted County, 117 F.3d 1065, 1067 (8th Cir.1997) ("Generally, mere verbal threats made by a state actor do not constitute a § 1983 claim") (internal citation omitted); Robertson v. Plano City, 70 F.3d 21, 24 (5th Cir.1995) (erroneous admonishment regarding punishment and prison does not violate substantive due process); Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir.1991) (police officers' threats to kill plaintiff on more than one occasion, telling plaintiff's children they would never see their father again if the officers found him, and refusal to allow children to give father a goodbye hug when he was arrested constituted "despicable and wrongful" harassment, but did not rise to the level of a constitutional violation); Nuchols v. Berrong, Case No. 3:03-cv-301, 2006 WL 2400983 at **3-4 (E.D. Tenn. Aug. 18, 2006) (Sheriff's threat that he would burn the plaintiff's house down, set her dog on fire, and that "there wouldn't be a member of her family left" was "highly offensive" but did not create substantive due process liability under § 1983).  Other courts have held that such threats do not violate the Fourth or Eighth Amendments when made during an arrest; Hopson v. Fredericksen, 961 F.2d 1374, 1378-79 (8th Cir.1992)

---

[45]This Circuit has, however, held that verbal taunts by other prison inmates does not violate the Eighth or Fourteenth Amendments.  Edwards v. Gilbert, 867 F.2d 1271, 1274 n. 1 (11th Cir. 1989).  Cf. McFadden v. Lucas, 713 F.2d 143, 146 (5th Cir. 1983) (threatening language and gestures of a corrections officer do not generally violate an inmate's Eighth Amendment rights).

(officer's statement during an arrest that he would knock the arrestee's teeth out and his use of a racial slur did not violate the Fourth Amendment); <u>Keyes v. City of Albany</u>, 594 F.Supp. 1147, 1155 (N.D.N.Y.1984) ("verbal abuse, including vile language and racial epithets" directed at bystanders during an arrest did not violate their constitutional rights).

In light of this caselaw treating verbal abuse, even vile language and racial epithets, as insufficient to constitute a constitutional violation, and, in light of the Supreme Court's "reluctan[ce] to expand the concept of substantive due process" and admonition that "judicial restraint requires courts to exercise the utmost care in this are," <u>Collins v. City of Harker Heights, Tex.</u>, 503 U.S. 115, 125 (1992),  the Court cannot state that the Plaintiff has successfully established a substantive due process claim.[46]  Instead, it appears that the alleged conduct by the Officer Defendants falls into the category of misconduct for which there is no available constitutional remedy.  If anything, the threats would be considered an assault, which falls within Florida's tort liability scheme.  <u>See</u> <u>Collins</u>, 503 U.S. at 128 (stating that the Due Process Clause does not purport to supplant state tort law); <u>Dacosta v. Nwachukwa</u>, 304 F.3d 1045, 1948-49 (11th Cir. 2002) ("Rights conferred by state tort law, and adequately protected by that law, 'remain largely outside the scope of substantive due process jurisprudence.'") (quoting <u>Skinner v. City of Miami</u>, 62 F.3d 344, 347 (11th Cir. 1995)).  Summary Judgment is due to be granted on this claim.

---

[46]This case law, coupled with the lack of any controlling authority establishing that verbal threats alone shock the judicial conscience, would also afford the Officer Defendants qualified immunity protection as it does not appear that the law on threats by government officials was clearly established at the time of the alleged events.

H.    Damages

Having disposed of the Defendants' motions for summary judgment, the following claims remain for trial: (1) a Fourth Amendment claim for unlawful entry, arrest, and seizure; and (2) two Fourth Amendment claims for excessive force.  It appears from the Plaintiff's Second Amended Complaint that he is seeking relief as to these claims in the form of compensatory damages for his constitutional injuries, pain and suffering damages for humiliation and physical injuries, punitive damages, and damages for loss of enjoyment of life relating to the fact that the Plaintiff was allegedly forced to sell his home and relocate to another town.[47]

As this case is now set for trial during the next trial term, the Court finds it necessary and appropriate to remind the Plaintiff as he prepares for trial that only damages which are proximately caused by a constitutional tort may be recovered in a § 1983 action.  And, '[f]or damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have  occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue."  Jackson v. Sauls, 206 F.3d 1156 (11th Cir. 2000).

---

[47]The Plaintiff also seeks attorneys' fees.  However, the Court has previously ruled that *pro se* plaintiffs are not entitled to attorneys' fees.  See Doc. 41.  The Plaintiff is therefore reminded that he may not seek damages on that basis.

Damages which are speculative, or too far attenuated from the tortious acts cannot be recovered.[48]

## CONCLUSION

Accordingly, upon due consideration, it is hereby ORDERED and ADJUDGED as follows:

(1)     Defendant Devon Turner's Dispositive Motion for Final Summary Judgment (Doc. 91) is GRANTED IN PART AND DENIED IN PART.  Summary Judgment is granted in favor of Turner and against the Plaintiff as to Count VI ("violation of freedom of speech"), and Count VII ("violation of the substantive component of the fourteenth amendment's due process clause") as set forth in the Plaintiff's Second Amended Complaint (Doc. 73).  In all other respects Defendant Turner's Dispositive Motion for Final Summary Judgment (Doc. 91) is DENIED, and the Plaintiff may proceed with his two remaining claims of "illegal unreasonable seizure and/or entry" (Count I) and excessive force (Count II) against Defendant Turner.

(2)     Defendants Andrew Williams, Jr. and Deborah Rodden Williams' Motion for Summary Judgment (Doc. 92) is GRANTED.  Summary Judgment is granted in favor of

---

[48]For example, the Plaintiff also sought compensatory damages for lost income with respect to the sale of his house for allegedly less than what he could have sold it for at some future date. That request for relief was tied solely to his two claims alleging false probable cause affidavits, which are now out of the case.  See Second Amended Complaint, pp. 13, 15.  In addition, the Court is not aware of any controlling authority which would allow the recovery of such speculative damages.  Therefore, the Court finds that the Plaintiff may not seek damages relating to the allegedly low sale price of his home.

Andrew Williams, Jr. and Deborah Rodden Williams and against the Plaintiff as to all claims set forth against them (Counts VI and VII) in the Plaintiff's Second Amended Complaint (Doc. 73).

(3)    Defendant Rita Butz's Dispositive Motion for Summary Judgment (Doc. 95) is GRANTED IN PART AND DENIED IN PART.  Summary Judgment in granted in favor of Defendant Butz and against the Plaintiff as to Count VI ("violation of freedom of speech"), and Count VII ("violation of the substantive component of the fourteenth amendment's due process clause") as set forth in the Plaintiff's Second Amended Complaint (Doc. 73).  In all other respects Defendant Butz's Dispositive Motion for Final Summary Judgment (Doc. 91) is DENIED, and the Plaintiff may proceed with his two remaining claims of  "illegal unreasonable seizure and/or entry" (Count I), and excessive force (Count II) against Defendant Butz.

(4)    Defendant William "Bill" Olsen's Dispositive Motion for Summary Judgment (Doc. 96) is GRANTED IN PART AND DENIED IN PART.  Summary Judgment is granted in favor of Olsen and against the Plaintiff as to Count III ("unreasonable seizure by fabricating a probable cause affidavit"), Count VI ("violation of freedom of speech"), and Count VII ("violation of the substantive component of the fourteenth amendment's due process clause"), as set forth in the Plaintiff's Second Amended Complaint (Doc. 73).  In all other respects, Defendant Olsen's Dispositive Motion for Summary Judgment is DENIED, and the Plaintiff may proceed with his three remaining claims of "illegal

unreasonable seizure and/or entry" (Count I), and excessive force (Counts II and V) against Olsen.

(5)     Defendant Paul Valentino's Dispositive Motion for Summary Judgment (Doc. 97) is GRANTED IN PART AND DENIED IN PART.  Summary Judgment is granted in favor of Valentino and against the Plaintiff as to Count IV ("unreasonable seizure by fabricating a probable cause affidavit"), Count VI ("violation of freedom of speech"), and Count VII ("violation of the substantive component of the fourteenth amendment's due process clause"), as set forth in the Plaintiff's Second Amended Complaint (Doc. 73).  In all other respects, Defendant Valentino's Dispositive Motion for Summary Judgment is DENIED, and the Plaintiff may proceed with his two remaining claims of "illegal unreasonable seizure and/or entry" (Count I), and excessive force (Count II) against Valentino.

(6)     The Clerk is directed to enter judgment in accordance with the terms of this Order as to Defendants Andrew Williams, Jr., and Deborah Rodden Williams only.  The Clerk shall withhold the entry of judgment as to the remaining Defendants pending final resolution of this case.

(7)     The Defendants' Motions To Allow Computer and Accessories At Pre-Trial and Trial (Docs. 123, 125) are GRANTED. The Defendants may bring computers, and all necessary computer accessories into the courtroom during the pre-trial conference and trial of this case.

(8)    The Defendants' Motions to Supplement (Docs. 126, 127, 128, 129) are GRANTED.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 14th day of May, 2007.

_____
UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record